```
                IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF OHIO
                          WESTERN DIVISION
```

Robert Borger, Sr., et al.,       )
                                  )
                  Plaintiffs,     )    Case No. 1:06-CV-19
                                  )
     vs.                          )
                                  )
CSX Transportation, Inc.,         )
                                  )
                                  )
                  Defendant.      )

                            O R D E R

       This matter is before the Court on Defendant CSX Transportation, Inc.'s motions for summary judgment (Docs. No. 27 & 49) and Plaintiffs' motion to file a sur-reply (Doc. No. 74). For the reasons set forth below, Defendant's motions for summary judgment are well-taken and are **GRANTED**; Plaintiffs' motion to file a sur-reply is not well-taken and is **DENIED.**

## I. Background

       The facts of this case are straightforward and largely undisputed. Plaintiffs Robert Borger, Sr. and Derrick J. Atkinson are employed by Defendant CSX Transportation, Inc. ("CSX"). Borger is a locomotive engineer. Atkinson is also a locomotive engineer but at the relevant times in this case was a conductor.

       On the evening of June 21, 2004, Borger and Atkinson were engaged in transporting a train from the yard in Troy, Ohio to the Queensgate yard in Cincinnati, Ohio. As they headed south, Borger was notified that he needed to pull his train into a siding to allow a northbound train, Train Q506 ("Q506"), to

pass.  Borger stopped his train in a siding in Vandalia, Ohio. As Q506 passed their train, Borger was driven from the cab of the locomotive by a strong chemical smell.  Borger described it as "an immediate sharp smell . . . like somebody taking a fire extinguisher and blasting it in my face."  Borger experienced irritation in his eyes, a strong acidy taste in his throat, and then headaches and coughing afterward.

Atkinson, who actually had dismounted the locomotive prior to Q506's passing, testified that he noticed a strong smell, apparently coming from Q506, that lasted three to five minutes.  Atkinson experienced a harsh, metallic taste in his mouth and an almost immediate burning sensation in his eyes that lasted the remainder of the trip to Cincinnati.  Atkinson had a burning sensation in his throat and developed a severe headache and nausea, both of which persisted for several days.

Borger contacted a crew member on Q506 and notified him of the odor that was apparently being emitted from their train. They stopped Q506 further up the line to inspect the cars and noticed a faint odor around the fifteenth car in line, car UTLX 130108 ("UTLX 130108"), a tank car which was carrying hydrochloric acid.  Nevertheless, the crew did not observe any visible leaks on UTLX 130108, and all the valves and hatches were secure.  Trainmaster Donley McCoy conducted another inspection of UTLX 130108, including the covers and appliances on top of the car, later that evening in Lima, Ohio and discovered no signs of leaks.  Finally, Timothy Manass, who is the manager for Fuel

2

Services for Hazardous Material Systems of CSX, conducted yet another inspection of Q506 the same evening when the train reached the yard in Walbridge, Ohio.  Like the others, Manass could find no visible signs of leaks on the train in general or on UTLX 130108 in particular.  Finally, the two-man crew who did the pre-departure brake inspection of Q506 at the yard in Queensgate did not observe any leaks or notice any unusual smells emanating from any of the cars at that time.

Q506 was the only apparent source for the odor experienced by Borger and Atkinson because there was no likely alternative source, such as a nearby factory or industrial area.  The most plausible explanation for the apparent venting of hydrochloric acid vapor, advanced by Plaintiffs' expert, is that UTLX 130108 was loaded with insufficient outage, or air space between the top level of the liquid and the top of the tank, for expansion.  The outside temperature and hydraulic motion of the train in motion caused the pressure to build inside of the tank car to the point that vapor was vented through the pressure release valve.  Alternatively, the pressure relief valve was defective to begin with and released vapor into the air at a lower pressure than it should have.  It is not disputed, however, that CSX did not own UTLX 130108 and that the shipper of the hazardous material in this case was Bayer Corporation.

Borger and Atkinson filed separate lawsuits against CSX pursuant to the Federal Employers Liability Act ("FELA"), 45 U.S.C. § 51, et seq., alleging that CSX negligently failed to

provide them with a safe workplace and consequently caused injuries to them as a result. The two cases were later consolidated and CSX has filed motions for summary judgment on the claims of each Plaintiff. Doc. Nos. 27 & 49. After briefing on CSX's motions for summary judgment was completed, Plaintiffs' moved to a file a sur-reply brief (Doc. No. 74) on the grounds that CSX's reply brief raised new arguments and evidence. This motion has been briefed and is ready for disposition as well.

## II. Summary Judgment Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The evidence presented on a motion for summary judgment is construed in the light most favorable to the non-moving party, who is given the benefit of all favorable inferences that can be drawn therefrom. United States v. Diebold, Inc., 369 U.S. 654 (1962). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)(emphasis in original). The Court will not grant summary judgment unless it is clear that a trial is unnecessary. The threshold inquiry to determine whether

there is a need for trial is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Id.

The fact that the weight of the evidence favors the moving party does not authorize a court to grant summary judgment. Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 472 (1962). "[T]he issue of material fact required by Rule 56(c) . . . to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or a judge to resolve the parties' differing versions of the truth at trial." First National Bank v. Cities Service Co., 391 U.S. 253, 288-89 (1968).

Moreover, although summary judgment must be used with extreme caution since it operates to deny a litigant his day in court, Smith v. Hudson, 600 F.2d 60, 63 (6th Cir.), cert. dismissed, 444 U.S. 986 (1979), the United States Supreme Court has stated that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477

5

U.S. 317, 327 (1986).  According to the Supreme Court, the standard for granting summary judgment mirrors the standard for a directed verdict, and thus summary judgment is appropriate if the moving party establishes that there is insufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  Id. at 323; Anderson, 477 U.S. at 250.

Accordingly, summary judgment is clearly proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial."  Celotex Corp., 477 U.S. at 322.  Significantly, the Supreme Court also instructs that the "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion" against a party who fails to make that showing with significantly probative evidence.  Id.; Anderson, 477 U.S. at 250.  Rule 56(e) requires the non-moving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial."  Id.

Further, there is no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or similar materials negating the opponent's claim.  Id.  Rule 56(a) and (b) provide that parties may move for summary judgment "with or without supporting affidavits."  Accordingly, where the non-moving party will bear the burden of proof at trial on a dispositive issue, summary judgment may be appropriate based solely on the pleadings, depositions, answers to interrogatories,

and admissions on file.

### III. Analysis

To establish a violation of FELA, the plaintiff must prove the traditional common law elements of negligence: duty, breach of duty, foreseeability, and causation. Adams v. CSX Transp., Inc., 899 F.2d 536, 539 (6th Cir. 1990). FELA requires an employer to exercise reasonable care to furnish employees with a reasonably safe place in which to work. Adams, 899 F.2d at 539; Padgett v. Southern Ry. Co., 396 F.2d 303, 306 (6th Cir. 1968).

"An employer's duty of care in a FELA action turns in a general sense on the reasonable foreseeability of harm." Ackley v. Chicago & North Western Transp. Co., 820 F.2d 263, 267 (8th Cir. 1987). "The employer's conduct is measured by the degree of care that persons of ordinary, reasonable prudence would use under similar circumstances and by what these same persons would anticipate as resulting from a particular condition." Id. In general, under FELA, as the risk to an employee increases, an employer's duty increases. Id.

A major difference between a statutory FELA action and a common law negligence action exists in the element of causation. In order to satisfy the "causation" element in a FELA action, a plaintiff need only show that the employer "in whole or in part" caused his or her injury. Rogers v. Missouri Pac. R. Co., 352 U.S. 500, 507 (1956). To determine whether an employee has presented a jury question on causation in a FELA action, "the

test . . . is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought."  Id. at 506; see also Ross v. Chesapeake & Ohio Ry. Co., 421 F.2d 328, 329 (6th Cir. 1970).  In short, the causation question is not whether the employer placed its employees in a locale which proved to be unsafe, but whether the employer, by failing to exercise reasonable care, caused the plaintiff's injuries.  Padgett, 396 F.2d at 306.  Nevertheless, the plaintiff still bears the burden of proving that the railroad was in fact negligent.  Van Gorder v. Grand Trunk Western R.R., Inc., 509 F.3d 265, 269 (6th Cir. 2007).

   Plaintiffs claim that CSX's negligence led to the apparent hydrochloric acid vapor leak from UTLX 130108, and that, therefore, CSX is liable for their injuries pursuant to FELA for failure to provide them with a safe workplace.  CSX's motions for summary judgment invite the Court to assume that in fact there was a hydrochloric acid vapor leak from UTLX 130108.  Nevertheless, CSX argues, it is not liable for Plaintiffs' injuries because a such a leak was not foreseeable and it otherwise lacked notice that there were any defects in UTLX 130108.  Plaintiffs, on the other hand, argue that CSX violated a number of federal safety regulations in this case and that, therefore, CSX is negligent per se.  Because CSX is negligent per se, Plaintiffs argue, they are relieved from having to prove the elements of notice and foreseeability.

A railroad's violation of a federal statute or regulation constitutes a breach of its duty to the employee and results in negligence per se if the breach contributed to the employee's injury. Colonna v. Wheeling & Lake Erie Ry. Co., No. 96-3039, 1997 WL 705095, at *2 (6th Cir. Nov. 5, 1997); Walden v. Illinois Central Gulf R.R., 975 F.2d 361, 364 (7th Cir. 1992) (holding that a violation of 49 C.F.R. § 220.49 constitutes negligence per se). There are, needless to say, a veritable host of federal safety regulations concerning railroads and shipment of hazardous materials. Nevertheless, in this case, Plaintiffs have failed to demonstrate that CSX violated any federal regulation concerning the shipment of hazardous materials. Plaintiffs, therefore, have failed to demonstrate that CSX was negligent per se.

Primarily Plaintiffs argue that CSX violated 49 C.F.R. § 173.31 by failing to properly conduct a pre-shipping examination of UTLX 130108. Section 173.31 provides in pertinent part:

> (d) Examination before shipping.
>
> (1) No person may offer for transportation a tank car containing a hazardous material or a residue of a hazardous material unless that person determines that the tank car is in proper condition and safe for transportation. As a minimum, each person offering a tank car for transportation must perform an external visual inspection that includes:
>
> (i) Except where insulation or a thermal protection system precludes an inspection, the tank shell and heads for abrasion, corrosion, cracks, dents, distortions, defects in welds, or any other condition that makes the tank car unsafe for transportation;

9

>   (ii) The piping, valves, fittings, and gaskets for corrosion, damage, or any other condition that makes the tank car unsafe for transportation;
>
>   (iii) For missing or loose bolts, nuts, or elements that make the tank car unsafe for transportation;
>
>   (iv) All closures on tank cars and determine that the closures and all fastenings securing them are properly tightened in place by the use of a bar, wrench, or other suitable tool;
>
>   (v) Protective housings for proper securement;
>
>   (vi) The pressure relief device, including a careful inspection of the rupture disc in non-reclosing pressure relief devices, for corrosion or damage that may alter the intended operation of the device;
>
>   (vii) Each tell-tale indicator after filling and prior to transportation to ensure the integrity of the rupture disc;
>
>   (viii) The external thermal protection system, tank-head puncture resistance system, coupler vertical restraint system, and bottom discontinuity protection for conditions that make the tank car unsafe for transportation.
>
>   (ix) The required markings on the tank car for legibility; and
>
>   (x) The periodic inspection date markings to ensure that the inspection and test intervals are within the prescribed intervals.

49 C.F.R. § 173.31(d). Plaintiffs argue that CSX was negligent per se because John Hamm, one of the two carmen who did the pre-departure inspection of Q506, testified that he did not perform any of the specific inspection points delineated in subsections (i) through (x) of § 173.31. However, as CSX correctly points out in its reply brief, § 173.31 places the duty of performing these specific inspections on the offeror of the tank car for shipping. In this case, the offeror of UTLX 130108 for shipping

was Bayer Corporation.  Therefore, pursuant to § 173.31(d), it was Bayer's duty to perform these inspections, not CSX's.

In fact, another federal regulation imposes a different inspection duty on carriers of hazardous materials:

> At each location where a hazardous material is accepted for transportation or placed in a train, the carrier shall inspect each rail car containing the hazardous material, at ground level, for required markings, labels, placards, securement of closures and leakage. This inspection may be performed in conjunction with inspections required under parts 215 and 232 of this title.

49 C.F.R. § 174.9.  In this case, it is not disputed that two carmen, including John Hamm, in the course of performing the ground level Class 1 brake inspection of Q506 before departure also looked for signs of leaks on each of the cars and found none.  Hamm Dep. at 41-42; 72-76.  Therefore, the record demonstrates that CSX complied with its duty pursuant to § 174.9 to conduct a ground level inspection of the cars.

Plaintiffs also claim that CSX violated 49 C.F.R. § 174.3 by accepting for shipment hazardous materials that were not in conformance with federal safety regulations.  Section 174.3 states: "No person may accept for transportation or transport by rail any shipment of hazardous material that is not in conformance with the requirements of this subchapter."  Plaintiffs argue that had UTLX 130108 been properly inspected and properly laded it would not have leaked.  Since UTLX 130108 did leak it either was not inspected properly or was not laded properly.  Therefore, UTLX 130108 was not in compliance with federal safety regulations, and as a consequence, CSX violated §

11

174.3 by accepting a non-conforming shipment of hazardous materials. Plaintiffs' syllogism with respect to § 174.3, however, would lead to the imposition of strict liability on CSX for their injuries, which is not permissible under FELA. See, e.g., Wilkerson v. McCarthy, 336 U.S. 53, 61 (1949)(stating that FELA does not make the railroad an absolute insurer against damages resulting from personal injury to its employees); Jordan v. Southern Ry. Co., 970 F.2d 1350, 1352 (4th Cir. 1990) ("FELA is not a no-fault worker's compensation statute[.]").

      Plaintiffs' argument, however, is refuted by other applicable federal regulations. The Department of Transportation requires the shipper of hazardous materials to certify to the carrier that the cargo has been offered for transportation in accordance with the applicable safety regulations:

> (a) General. Except as provided in paragraphs (b) and (c) of this section, each person who offers a hazardous material for transportation shall certify that the material is offered for transportation in accordance with this subchapter by printing (manually or mechanically) on the shipping paper containing the required shipping description the certification contained in paragraph (a)(1) of this section or the certification (declaration) containing the language contained in paragraph (a)(2) of this section.
>
> (1) "This is to certify that the above-named materials are properly classified, described, packaged, marked and labeled, and are in proper condition for transportation according to the applicable regulations of the Department of Transportation."
>
> Note: In line one of the certification the words "herein-named" may be substituted for the words "above-named".
>
> (2) "I hereby declare that the contents of this consignment are fully and accurately described above by the proper shipping name, and are classified, packaged,

>           marked and labelled/placarded [sic], and are in all
>           respects in proper condition for transport according to
>           applicable international and national governmental
>           regulations."

49 C.F.R. § 172.204(a).[1]  As interpreted by the Department of Transportation, the carrier is entitled to rely on the shipper's certification that the hazardous materials have been packaged for shipment properly and will only be liable for accepting a non-conforming shipment if it had actual or constructive notice of the discrepancy.  Thus, the carrier is only required to perform a visual inspection for leaks or other damage to the packaging; it is not required to inspect the hazardous material package to determine whether the shipper complied with the safety regulations.  See Hazardous Materials: Formal Interpretation of Regulations, 63 Fed. Reg. 30411, 30412 (June 4, 1998); AD Trans. Express, Inc. v. United States, 290 F.3d 761, 766 (6th Cir. 2002)(agency's interpretation of its own regulations entitled to substantial deference).  Consequently, Plaintiffs' expert's opinion that CSX violated federal regulations merely for accepting a shipment of hazardous materials which later happened to leak is incorrect as a matter of law.

In this case, it is clear that the shipper had the responsibility for ensuring that UTLX 130108 was in the proper condition for shipping hazardous materials and that it was loaded

---

[1] One of the relevant exceptions to the certification requirement imposed on the shipper is when the carrier supplies the cargo tank.  49 C.F.R. § 172.204(b)(1)(i). That exception is not applicable in this case, however, because CSX did not supply UTLX 130108 for shipment.

properly, leaving appropriate outage for expansion of the hydrochloric acid during transportation.  Consequently, unless the shipper failed to provide a proper § 172.204 certification to CSX, CSX's duty was limited to a visual inspection of UTLX 130108 for leaks or damage to the tank.  The record shows that CSX complied with this duty by performing a visual inspection of the cars on Q506 and there is no evidence that any of the cars, including UTLX 130108, were leaking or damaged at the time of departure.  Therefore, CSX had no actual or constructive notice that UTLX 130108 was not fit for transporting hydrochloric acid.  The Court does note that there is no evidence in the record that Bayer Corporation actually provided a § 172.204 certification to CSX.  Nevertheless, this failure of proof falls on Plaintiffs because they have the burden of demonstrating that CSX had a duty to perform more than just a visual inspection of UTLX 130108 before accepting it for shipment.  In other words, it was incumbent on Plaintiffs to adduce evidence that Bayer Corporation failed to provide a § 172.204 certification, which then would have triggered a duty on the part of CSX to perform a complete inspection of UTLX 130108.

In summary, the record demonstrates that the release of hydrochloric acid vapor from UTLX 130108, assuming such did occur, was not foreseeable to CSX.  Therefore, CSX is not liable for Plaintiffs' injuries under FELA.  Accordingly, both of CSX's motions for summary judgment are well-taken and are **GRANTED.**

### IV. Motion to File Sur-reply

Plaintiffs move the Court to file a sur-reply brief on the grounds that CSX raised new arguments and evidence in its reply brief. However, as CSX accurately argues, Plaintiffs have not specified which arguments or evidence CSX failed to raise in its principal motions. Presumably, however, the alleged new arguments or evidence concern the affidavit of CSX's expert, William Honeycutt. Nevertheless, Mr. Honeycutt's affidavit is not new evidence. For the most part, Mr. Honeycutt's affidavit simply summarizes his expert report, which Plaintiffs received in July 2007 in the normal course of discovery. Finally, CSX has not used Mr. Honeycutt's affidavit to raise new issues. Rather, it is obvious that CSX submitted Mr. Honeycutt's affidavit with its reply brief to rebut Plaintiffs' contention in their memorandum in opposition that CSX was negligent per se for violating federal regulations which allegedly imposed a duty on CSX to perform more than just a visual inspection of the tank cars on Q506. This was an appropriate use of Mr. Honeycutt's affidavit in the reply brief. See Peters v. Lincoln Elec. Co., 285 F.3d 456, 476 (6th Cir. 2002)(holding that witness's affidavit was timely submitted with reply brief because "Smolik's affidavit supported Lincoln's reply brief, which contested issues brought to light in Peters' opposing brief.").

Accordingly, Plaintiffs' motion to file a sur-reply brief is not well-taken and is **DENIED.**

**IT IS SO ORDERED**

15

Date April 25, 2008                        s/Sandra S. Beckwith
                                                   Sandra S. Beckwith, Chief Judge
                                                   United States District Court